IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

## STATE OF TENNESSEE v. ROBERT WILLIAM WARD

**Appeal from the Criminal Court for Davidson County
No. 2016-C-1605   Cheryl A. Blackburn, Judge**

_____

### No. M2017-02269-CCA-R3-CD

_____

The Defendant, Robert William Ward, was convicted by a Davidson County Criminal Court jury of attempted first degree murder with serious bodily injury, a Class A felony, and possession of a firearm during the commission of or attempt to commit a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-12-101 (2018) (criminal attempt), 39-13-202 (2014) (first degree murder), 40-35-501(k)(5) (2014) (amended 2015, 2016) (sentencing for attempted first degree murder with serious bodily injury), 39-17-1324 (2014) (firearms possession). He received an effective thirty-five-year sentence, to be served consecutively to his sentence in another case. On appeal, he contends that: (1) the evidence is insufficient to support his attempted first degree murder with serious bodily injury conviction, (2) the trial court erred in admitting evidence of the Defendant's prior conduct, (3) the court erred in failing to strike hearsay testimony from the record, (4) the court erred in admitting a State's witness's prior statement, (5) the court erred in limiting his cross-examination of a State's witness, (6) cumulative trial error requires relief, and (7) his attempted first degree murder sentence is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Dawn Deaner (at trial and on appeal), District Public Defender; Emma Rae Tennent (on appeal), Chris Street-Razbadouski (on appeal), Chase Cunningham (at trial), and Kristin Neff (at trial), Assistant District Public Defenders, for the appellant, Robert William Ward.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Glenn R. Funk, District Attorney General; Doug Thurman and Byron Pugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to an incident on March 19, 2015, in which Valerie Carter was shot in the head. Ms. Carter was gravely injured but survived the shooting.

At the trial, the victim testified that, on March 19, 2015, she was awakened shortly after 5:00 a.m. by a friend because the victim's cell phone had been making text message alert sounds. The victim said the messages were from the Defendant, whom she had known for about three years at that time. The victim denied she had given a written statement to a detective in which she said that she had known the Defendant for fifteen years and that he had been her boyfriend. She said the Defendant wanted her to purchase cocaine for him, which she had done for him on two previous times within the past two weeks. She said that on two previous occasions she purchased thirteen grams for $520 and that on March 19, 2015, she purchased ten grams for $400. She said that on each occasion, she called the drug dealer, met with the Defendant, and went with the Defendant to a location where she was to meet the drug dealer. She said that on each occasion, the Defendant arranged for someone to take her and the Defendant to the location, which was in Madison, Tennessee. She said the Defendant did not purchase drugs directly from the dealer because the dealer did not trust the Defendant. She said that on the second occasion she bought drugs for the Defendant, the Defendant got out of the car and went to the car where she was buying the drugs from the dealer. She said the dealer was going to leave when the Defendant approached and that the Defendant allowed her to complete the transaction. She said the Defendant was angry afterward because the dealer would not sell to him directly.

Regarding the transaction on March 19, the victim testified that the Defendant had a person whom the victim did not know pick up the victim. She said the person took her to Nikki Harper's house in Gallatin. The victim said she had met Ms. Harper a few days earlier. The victim said the Defendant called Jennifer Deyhle to take them to Madison for her to complete the drug purchase for the Defendant. The victim said Ms. Deyhle arrived in a silver sedan around 6:00 or 6:30 a.m. to pick up the victim, the Defendant, and Ms. Harper. The victim said she was supposed to meet the drug dealer at 8:00 a.m. She said not much conversation occurred on the ride to the location of the deal, although the Defendant said he wanted her to ask if he could meet the dealer to purchase drugs directly. She said she got out of Ms. Deyhle's car, got into the drug dealer's car, completed the transaction, returned to Ms. Deyhle's car, and gave the drugs to the Defendant. She said that she had asked the dealer about meeting the Defendant but that

the Defendant was not able to talk to the dealer, which angered the Defendant. She said she was with the drug dealer for "no more than five minutes."

The victim testified that although the plan had been for Ms. Deyhle to take the Defendant and Ms. Harper to Ms. Harper's house and to take the victim to the victim's friend's house, the Defendant told Ms. Deyhle as they left the location of the drug deal to go a different direction than the way they had come. The victim said that as they traveled, the Defendant told Ms. Deyhle to turn into a neighborhood. The victim said they were all "getting high on cocaine" at this point. She said that when Ms. Deyhle stopped at a stop sign, the Defendant got out, opened the back car door where the victim was seated, and pulled her from the car. She said the Defendant repeatedly hit the top of her head "pretty hard," knocking her off her feet. She said she asked the Defendant why he was doing it and asked him to stop. She said she screamed at the Defendant. She said she did not notice anything in the Defendant's hand when he was striking her and that she was "going in and out" and "fainting in and out." She said the Defendant pulled a gun and shot her face. She said she had not seen the gun until the Defendant put it in her face. She agreed he placed it against her cheek. She said the only thing the Defendant said to her was, "[Y]ou'll quit being a smart b----." She said the Defendant ran away as she fell to the ground. She said she heard her neck snap when she hit the ground. She said that the time from when she injected cocaine until she was shot was "within a matter of minutes."

The victim testified that she had not had any indication these events were about to occur. She said she had argued with the Defendant after the drug transaction and before the assault because he was supposed to give her a morphine pill in exchange for setting up the drug transaction but that he did not have the pill. She said the argument "died down" and that "not even ten whole words [were] said back and forth." She said the argument began when the Defendant gave pills of a different variety to Ms. Harper and Ms. Deyhle but did not have the morphine pill for her.

The victim testified that an elderly African-American woman came to her and held a towel on the victim's face. The victim recalled speaking to a 9-1-1 operator and the arrival of emergency responders. She said the next thing she remembered was waking up in the hospital with detectives speaking to her and showing her photographs. The victim's medical records were received as an exhibit.

Regarding a syringe found at the scene, the victim testified that she had been in the process of injecting cocaine when the altercation occurred. She said that she had not yet felt any effects of the cocaine when the Defendant began assaulting her and that she

-3-

typically did not feel an effect until twenty to thirty minutes after injecting cocaine, depending upon the amount injected. She said that she had not taken any other drugs on the date of the shooting.

The victim testified that her jaw broke and had to be wired and that she was unable to speak at first. She said she was "on a nebulizer," had a "trach," and had a feeding tube. She said she remained on the feeding tube for six months. She said that the bullet broke her neck and that she had to wear a neck brace. She said she had scarring where the bullet entered her cheek and that the left side of her face had been reconstructed. She said the bullet had damaged her esophagus and that she still had difficulty swallowing and had "ongoing pneumonia." She said she had undergone surgery for her injuries, and she rated the pain she had experienced from the gunshot as ten on a one-to-ten scale, with ten being the highest level of pain. She said the bullet was still in the back of her head.

The victim identified photograph exhibits depicting the location where Ms. Deyhle stopped at the stop sign. Referring to the exhibit, the victim identified the location where she and the Defendant were when the altercation occurred. The victim identified a photograph lineup and said she had identified the Defendant when she viewed it during her hospitalization. She identified the Defendant in the courtroom and agreed he was the person who shot her. When asked if she recalled making a prior statement that the Defendant looked shocked or afraid after he shot her, she said she had observed this when the Defendant struck her on the head but denied she ever used the word "afraid" to describe the Defendant's demeanor. She said she did not recall much from her conversations with law enforcement officers while she was hospitalized.

The victim agreed that she "spent time hanging out" with Ms. Harper and the Defendant on the night before the shooting. The victim said that, other than the second drug deal when the Defendant tried to get out of the car to talk directly to the dealer, she and the Defendant never had any problems before the shooting.

The victim testified that she met the drug dealer around 8:00 a.m., although she said she was unsure of the exact time. She agreed that the transaction took three to five minutes. She said that after she bought the cocaine, the Defendant weighed it. She said the Defendant talked to the other women and had a "small argument" with the victim about the morphine pill he was supposed to give her. She said she got the cocaine she injected that morning from the drug dealer, not the Defendant. She said the dealer gave her one-half gram, which was enough for about eight injections. She said she was never out of the Defendant's sight when she left the dealer's car and brought the drugs to the car in which the Defendant was waiting. She said the Defendant had weighed the drugs

-4-

each time she made a purchase for him. She said that she never stole drugs from the Defendant and that he never accused her of stealing drugs from him.

The victim acknowledged that she had prior convictions for aggravated burglary, "felony flagrant non support," and fourteen counts of theft. She said she was addicted to morphine. She said that although she had just injected cocaine when the Defendant pulled her from the car, she had not yet felt the cocaine's effects and had no doubt that the Defendant was the person who shot her.

The victim agreed that, since the shooting, she and Ms. Deyhle had been housed together in the Sumner County Jail, although they were in different areas of the jail. She agreed that she had had the opportunity to speak with Ms. Deyhle in the jail. The victim said they had not spoken about the shooting, other than the victim's having asked Ms. Deyhle if she had known ahead of time that the Defendant was going to shoot the victim.

The victim denied that she told her former boyfriend that the Defendant shot her because the Defendant was mad because he had wanted her to shoot the drug dealer. She denied telling Ms. Deyhle that the Defendant was mad at the victim because she would not "rob" her drug dealer. She said the Defendant had short hair on the date of the shooting.

Sylvester Hall testified that he woke around 7:00 or 7:30 a.m. on March 19, 2015. He said that between 8:00 and 10:00 a.m., he heard arguing and opened the door of his house. He said he heard a young woman yell "Robert, don't." He later estimated the time as being around 8:00 to 8:30 a.m. and said he had heard only one voice. He said he had been about to leave home to go to a store. He said he closed the door and heard a gunshot. He said that he told his wife to call 9-1-1 and that he called 9-1-1, as well. He said he looked outside and saw a young woman lying on the ground and a young man getting into the front passenger side of a silver or gray car. He said the man had dark, shoulder-length hair and wore a black leather coat, blue jeans, and black boots. Mr. Hall said the man was white and around 6' tall. Mr. Hall did not think he was wearing his glasses at the time. Mr. Hall said the car sped away after the man got into it. Mr. Hall said he could not see the driver or determine if anyone other than the man and a driver were inside. Mr. Hall said he went outside to aid the woman, whom he said had been shot in the face and had an injury on her cheekbone. He said the woman was "not really" able to communicate with him and his wife. He said he did not know the woman or anyone in the car. Referring to photograph exhibits, Mr. Hall identified his house, where the victim had lain, where the silver car had traveled, and the view from his porch.

-5-

Cynthia Southall-Hall testified that she was home with her husband on the morning of March 19, 2015. She said she heard a young woman yelling, "Robert, please don't, Robert don't," and "Don't do this, Robert." She said the woman sounded desperate and scared. Ms. Southall-Hall said she looked out a window, heard a shot, and saw the woman "go down." She said she saw a gray car speed away. She later said she heard her husband yelling that a woman had been shot and that she looked out the window and saw the woman "going down." Ms. Southall-Hall said she did not see anyone other than the woman. She said she called 9-1-1 and that her husband may also have called 9-1-1. Ms. Southall-Hall said that the woman tried to speak but that she applied pressure to the woman's jaw and cheek area and told the woman not to talk.

Ms. Southall-Hall testified that she talked to the police about what happened. Referring to a photograph exhibit, she identified her house, the window from which she saw the woman falling, and where she saw the gray car. She said she did not know anyone involved in the case, including the victim.

Jennifer Deyhle testified that the Defendant called her on the early morning of March 19, 2015, and asked her to take him to Madison. She said he sent her text messages and called repeatedly until she answered. She said she had "[a] little bit" of difficulty understanding him because he spoke rapidly. She said that she had known him for about two years before this date. She said she went in her silver Ford Taurus to a house in Gallatin, where she picked up the Defendant, Ms. Harper, and the victim. She said the house belonged to Greg, whose last name she did not know. When asked to describe the relationship between the Defendant and Ms. Harper at the time, Ms. Deyhle said they were "together." Ms. Deyhle said that the Defendant sat on the front passenger seat, that Ms. Harper sat behind her, and that the victim sat behind the Defendant. Ms. Deyhle said that everyone was "high" but that she did not see anyone using drugs on the way to Madison. She said the victim spoke rapidly, was excited, and appeared to be "ready for that next hit." She said the Defendant and the victim argued about a Klonopin pill the Defendant was supposed to give the victim. She agreed the victim yelled and screamed at the Defendant. Ms. Deyhle said the argument ended when the Defendant said he would give the victim a pill when they returned to Greg's house. Ms. Deyhle said that although she did not pay attention, she was "pretty sure" the Defendant gave money to the victim when they arrived at the location where the Defendant had directed Ms. Deyhle to drive. Ms. Deyhle said the victim went to another car and stayed inside it for about ten minutes. Ms. Deyhle said the victim returned to Ms. Deyhle's car and handed drugs to the Defendant. Ms. Deyhle said they left the location within fifteen minutes of their arrival. She denied that anyone used drugs in the parking lot of the apartment

-6-

complex where the transaction took place but said the victim "started to" use drugs in the parking lot.

Ms. Deyhle testified that she had thought she was going to take the Defendant, the victim, and Ms. Harper back to the place where she had picked them up. She said, however, that the Defendant directed her to drive on a neighborhood road, rather than the main road. She said that when she stopped at a stop sign, the Defendant jumped out of the car. She said the victim was still preparing to inject cocaine when Ms. Deyhle stopped. Ms. Deyhle said she did not see a weapon. Ms. Deyhle said the victim had her own supply of cocaine. Ms. Deyhle said the Defendant began screaming at the victim to get out of the car. Ms. Deyhle said the victim asked the Defendant "why." Ms. Deyhle said she was unsure how the victim's door was opened but that the Defendant pulled the victim from the car and hit the top of the victim's head repeatedly. Ms. Deyhle thought the Defendant hit the victim with his fist. She said that she looked away for a moment and that when she looked again, she saw the gun and heard a pop. She said she was shocked and did not understand what was happening. She said she had not seen a gun until she heard the pop. She said that the Defendant appeared to be calm and not to be angry before he shot the victim and that he appeared calm as well as "a little pumped" and slightly panicked when he returned to the car after the shooting. She agreed the argument about the Klonopin pill occurred approximately thirty minutes before the Defendant shot the victim.

Ms. Deyhle testified that the Defendant got into the car with the gun and told her to drive away. She said she drove back to Gallatin. She said the Defendant stated that if she or Ms. Harper "said anything," he would retaliate or have someone do it on his behalf. Ms. Deyhle said that after they returned to Gallatin, the Defendant had her take him to a bridge over the Cumberland River, where he threw the gun into the river. She said that the gun was a .22-caliber weapon and that she thought it was a revolver. She said she was familiar with guns because her father was a retired police officer. She said the Defendant had never said anything to her about how or why the shooting occurred. She acknowledged spending the rest of the day driving around and using drugs with the Defendant. She denied they returned to Greg's house after the shooting and agreed that around 10:30 or 11:00 a.m., she, the Defendant, and Ms. Harper went to a house in Westmoreland which she later learned belonged to Felicia Whitfield. Ms. Deyhle agreed she smoked crack cocaine at Ms. Whitfield's house.

Ms. Deyhle testified that she was interviewed by Detective Davis about the incident. She said he showed her a photograph lineup and asked if she saw anyone she knew. She said she circled the photograph of a person she recognized. The photograph

lineup was received as an exhibit. She acknowledged that she had told Detective Davis that the man whose photograph she had circled beat up a woman and had hit the woman's head, that she heard "pop, pop," and that the man jumped into her car and said "go, go" while pointing a gun at her. Referring to photograph exhibits, she identified the location where she stopped at the stop sign and indicated the direction her car had faced. She identified the Defendant in the courtroom and said he was the person she had seen with a gun on March 19, 2015.

Ms. Deyhle said that on the date of the incident, the Defendant had short hair. She acknowledged that she needed money on the date of the incident and said she gave the Defendant a ride because she needed gas money and because he was a friend.

Ms. Deyhle denied that she told Greg Lamica she got out of the car at the stop sign. She denied having told anyone that the police had stated they would take away her children if she did not talk to the police about the shooting. She agreed that when she met with Detective Davis, she believed she might be charged with the shooting because the Defendant had been charged. She denied she had been mad at the Defendant when she spoke to Detective Davis but acknowledged telling the detective she was "so p-----off at [the Defendant] for putting [her] in the predicament" because she had "kids and lots to lose." She agreed she did not tell the detective about going to Ms. Whitfield's house and smoking crack cocaine. She said she had never talked to the victim about the shooting but recalled the victim's telling her that the victim believed the shooting occurred because the victim would not rob the drug dealer.

Ms. Deyhle agreed that she had been in jail with the victim and Ms. Whitfield. She said she associated with different people in the jail than them, however.

Felicia Whitfield testified that she and Ms. Harper were cousins. She said the Defendant, Ms. Harper, and Ms. Deyhle came to her house in a silver car about 10:30 p.m. on March 19, 2015, and that Ms. Harper asked if she and her boyfriend could spend the night. Ms. Whitfield said she allowed Ms. Harper and the Defendant to stay. Ms. Whitfield said the Defendant wore a black leather jacket. She said Ms. Harper had lived with her until about three days earlier, when Ms. Whitfield had "kicked her out." Ms. Whitfield said, however, that she had not met the Defendant or Ms. Deyhle previously. Ms. Whitfield said that Ms. Deyhle did not appear frightened, that Ms. Deyhle asked about smoking crack cocaine in the house, and that Ms. Whitfield directed Ms. Deyhle to a bedroom to smoke. Ms. Whitfield acknowledged that she was unemployed and had a drug problem and that she smoked crack cocaine with Ms. Deyhle and injected cocaine the Defendant provided. Ms. Whitfield said that the Defendant and Ms. Harper slept in

-8-

Ms. Whitfield's bedroom and that Ms. Whitfield was unable to get into the bedroom until about 3:00 the following afternoon. Ms. Whitfield said that when she entered the room, "There was [sic] liquor bottles everywhere, dope bags everywhere, clothes everywhere." Ms. Whitfield said she "snapped out on" the Defendant and Ms. Harper for making a mess and told them she wanted them to leave her house.

Ms. Whitfield testified that when she confronted Ms. Harper and the Defendant, Ms. Harper stated she needed to talk to Ms. Whitfield. Ms. Whitfield said that after she and Ms. Harper spoke, Ms. Whitfield told Ms. Harper she wanted "to hear it, what had happened, from [the Defendant]." Ms. Whtifield said this occurred around 3:30 to 4:00 p.m. on March 20, 2015.

Ms. Whitfield testified that the Defendant then told her that his drug dealer was out of town and that he had been having the victim purchase drugs for him from the victim's dealer. Ms. Whitfield said the Defendant suspected the victim had been stealing money and drugs from him. Ms. Whitfield stated that the Defendant

> had gotten word and evidence that [the victim] was dipping into the sacks that he was sending her to get and taking half of his money, cutting the dope, and he was going to make it right. This was like the third dope run that they had went [sic] on, and he said that she was cussing him, calling him a p---- a-- b---- and all kinds of words when they finally got to . . . meet the dope man.

Ms. Whitfield stated that the Defendant told her, "When [the victim] got out of the car, he had told the driver to hit the neighborhood when [the victim] got back in but to make sure he had the dope first." She stated that the Defendant said the driver went into the neighborhood and stopped. Ms. Whitfield stated that the Defendant said he got out of the car, pulled the victim from the car, "pistol whipped" her, put the gun under her chin, pulled the trigger, and heard someone screaming behind him. Ms. Whitfield said the Defendant stated that the victim fell and hit her head on concrete, that he got into Ms. Deyhle's car, and that "they took off." Ms. Whitfield stated that the Defendant said he looked behind him, saw two people running on the sidewalk, and "knew at that given point he should have put two more bullets in her." When asked the reason the Defendant decided not to shoot the victim again, Ms. Whitfield said, "Because someone was running after or had hollered stop." Ms. Whitfield said the Defendant stated that "he jumped in the car, he knew people were around."

Ms. Whitfield acknowledged that the Defendant had stated he shot the victim under the chin and that she had later learned the gunshot wound was not in this location. Ms. Whitfield agreed that she had stated previously that she had been told the wound was on the victim's right side but that Ms. Whitfield later learned the wound was on the left side. She acknowledged that she had said the Defendant told her the drug deal was at the dealer's house but that she had later learned the deal took place inside a car.

Ms. Whitfield testified that immediately after she spoke with the Defendant about the shooting, she took her children to their father's house. Ms. Whitfield said that after she returned home, she heard the Defendant and Ms. Harper in the shower. She said that they were talking and were laughing but that she could not hear what was said. She also said she heard the Defendant talking about the shooting after she returned home. When asked about his demeanor, she said, "He was calm. . . . And then he became like to me violent with his voice and then back calm. I mean, it was kind of up and down."

Ms. Whitfield testified that she went to a friend's house. She said she had not taken the information about the shooting seriously and had gone to the friend's house to see if information about a shooting was on television news or Facebook. She said that she did not have cable television, a smartphone, or Internet access and that her friend found information online about the shooting and encouraged her to call Crime Stoppers. She said that she called Crime Stoppers but hung up immediately and that her friend called Crime Stoppers as she left his house. She said she did not hear what her friend said when he called Crime Stoppers. She was unsure of the time at which she left her friend's house but agreed it was "[m]aybe around dinner time."

Ms. Whitfield testified that after she left her friend's house, she went to the Westmoreland Police Department. She said she spoke with Westmoreland officers and gave a written statement. She said she told the Westmoreland police the information about which she had testified. She said that she returned home and that the Defendant and Ms. Harper were still there.

Ms. Whitfield testified that she returned to the Westmoreland Police Department later that evening and spoke with Metro Police Detective Davis. She said she told him the information about which she had testified. She said Detective Davis showed her photograph lineups, which were received as exhibits. She said she identified Ms. Harper and the man who had been at her house with Ms. Harper from the lineups.

Ms. Whitfield testified that she returned home around midnight and that the Defendant and Ms. Harper were there. Ms. Whitfield said that Ms. Harper and the

-10-

Defendant left her house around midnight or 12:30 a.m. and that they were arrested about five or ten minutes away from her house. She agreed that she "went and got high" after the Defendant left and was arrested. She said she did not get any money from the police.

She acknowledged that she did not tell the police about Ms. Deyhle's presence at her house. She also acknowledged that she told Detective Davis the Defendant had said he shot the victim because the victim had been putting baking soda in his drugs for a few months. She also acknowledged her written statement to the Westmoreland police that the Defendant had stated the victim owed him money because the victim had been taking his money.

Ms. Whitfield acknowledged telling Detective Davis that she had made the Defendant and Ms. Harper "dump all their stuff" to see whether they had any weapons and that the Defendant did not have a leather jacket. Ms. Whitfield acknowledged that she told a defense investigator about one month before the trial that she did not remember what the Defendant had worn and that his hair was shaved. She said she told Detective Davis that the Defendant had stated his initial plan was to rob the victim. Ms. Whitfield later acknowledged that this was not in her recorded statement. She agreed that she did not return telephone calls from the police after speaking with them on March 19, 2015.

Ms. Whitfield acknowledged that she had been convicted on May 12, 2016, of theft and of two counts of felony failure to appear. She acknowledged that she was a single mother of three children and that she had financial stress on March 19, 2015. She agreed that she had been unemployed and addicted to drugs at the time. She denied that she received any benefit from the police or Crime Stoppers related to this case.

Metro Nashville Police Detective James Davis testified that he was called to the scene of the shooting on March 19, 2015. He said he arrived after the crime scene officers had finished documenting the evidence. He said another detective had already interviewed the witnesses. Detective Davis said he was unable to meet with the victim that day due to her medical condition. He said that little information existed on March 19 for him to investigate. He said he received an email from Detective Cote, who worked the evening shift on March 19, which identified the Defendant. Detective Davis said he received a call from the Westmoreland Police Department on March 20[1] and that he went to the Westmoreland Police Department around 10:00 p.m. and spoke with Ms. Whitfield around 11:00 p.m. He said he recorded his interview of Ms. Whitfield. He said

---

[1] Other evidence showed that the date of the shooting was March 19, 2015.

Westmoreland Police Officer Hoskins provided him with a written statement Ms. Whitfield had given before Detective Davis had arrived. Detective Davis said Ms. Whitfield identified the Defendant from a photograph lineup.

Detective Davis testified that he met with the victim, who was hospitalized, on March 24. He said she was unable to speak due to her injuries but was able to write "a little bit." He said the victim appeared to understand him. He said that he showed her a photograph lineup and that she identified the Defendant as the person who shot her. Detective Davis acknowledged that he also met with the victim on March 30 and April 1, when she was better able to communicate. He said that on March 30, the victim wrote that she purchased eight grams of cocaine for $400 for the Defendant. Detective Davis said the victim claimed on April 1 that no argument over pills occurred. He said the victim was not able to provide a motive for the shooting. He said she was unable to speak and was medicated on each occasion that he talked to her between March 24 and April 1.

Detective Davis testified that he interviewed Ms. Deyhle on March 29 at the Madison precinct and that he made a video recording of the interview. He said that he showed her a photograph lineup and that she identified the Defendant as the person who assaulted and shot the victim. Detective Davis said Ms. Deyhle told him about an argument in the car over a pill.

Detective Davis agreed that Crime Stoppers received tips on March 20, that he did not review them until March 23, and that he did not do any follow-up investigation of the tips because the Defendant had already emerged as a suspect. Detective Davis said he never interviewed Greg Lamica.

Metro Nashville Police Sergeant Todd Leach testified that he was dispatched to the scene at 9:28 a.m. and arrived about four minutes later. He said he saw a woman "sprawled out on the ground" with two people who appeared to be aiding her. He said she appeared to have been shot in the right cheek and was unconscious. He said the people aiding the victim identified themselves as Mr. Hall and Ms. Southall-Hall and gave him a brief account of what had occurred and a description of the suspect. He said a syringe lay near the victim's head.

Metro Nashville Police Officer George Bouton, a crime scene investigator, testified that he took photographs and collected evidence at the scene. He identified photographs of the syringe, blood, tire impressions, and the view from the front porch of

the Hall residence. Officer Bouton said he collected the syringe and thought he collected some clothing that had been bagged by other officers.

Greg Lamica testified that on March 19, 2015, the Defendant had been staying with him for three days. Mr. Lamica said that on March 19, Ms. Deyhle picked up the Defendant, who was supposed to be going to get drugs, and Ms. Harper, who had been at the house with the Defendant. Mr. Lamica said that he did not see the victim that morning and that she had been at his house the previous night. He did not know if the victim was outside when Ms. Deyhle came to his house. Mr. Lamica thought Ms. Deyhle, Ms. Harper, and the Defendant left before noon. He said they returned around 3:00 to 3:30 p.m. and immediately went to the back bedroom. He said the Defendant appeared "very agitated." Mr. Lamica said Ms. Harper came out of the bedroom and asked him to turn on the news and that Ms. Deyhle and the Defendant came out shortly thereafter. Mr. Lamica stated that the Defendant looked out the window and that Mr. Lamica told them to leave his house. Mr. Lamica said the Defendant did not make any statements about a shooting. Mr. Lamica said the Defendant had a .22-caliber handgun during the three days the Defendant had been staying with Mr. Lamica and that Mr. Lamica told the Defendant to store the gun in a VCR tape case. Mr. Lamica said he talked to the police the day after the shooting and told them what he knew. He said that he had "run into" Ms. Deyhle at a "drug house" a couple of times since the shooting and that she told him she had talked to the police because they threatened to take her children and cause problems for her child in college. Mr. Lamica said he had heard Ms. Deyhle say she had gotten out of her car when the Defendant and the victim argued.

John Terry testified that in March 2015, he was employed as a defense investigator. As part of his investigation, he reviewed March 19 and 20, 2015 media releases related to the case and determined that several mentioned the victim's name. He said some of the media releases stated that the shooting was believed to be related to a drug deal. When asked if the media releases said that anyone came out of a house before the shot was fired, he said, "No, not in those words." When asked if the media releases mentioned anyone in the car other than the victim or whether the victim was in the car, he responded, "No, not by name." He acknowledged, though, that a newspaper article stated the victim had been a vehicle passenger and provided the description of a suspect. He said the media releases did not mention "screaming" or "yelling" before the shot was fired and did not mention the victim's being struck in the head. He said, however, that an article stated a witness told the police he heard the victim make a statement before the shot was fired.

-13-

Detective Davis was recalled and testified that when he interviewed Ms. Whitfield, she did not mention the victim by name before he identified the victim by name. He said, however, that Ms. Whitfield made a statement to a Westmoreland police officer a few hours before he spoke with her and that she identified "Valerie" in the earlier statement. He said that the media releases did not mention the victim's name and that media representatives had been at the scene of the shooting on March 19, 2015. He did not know how the media learned the victim's name but said it was police department policy not to release the information.

Private investigator Amber Treat testified that she spoke with the victim on July 20, 2016. Ms. Treat said the victim stated that the Defendant appeared shocked and scared when the gunshot was fired. Ms. Treat said the victim reported having a "small argument" about a Klonopin pill with the Defendant when they were on the way to meet a drug dealer on the day of the shooting.

Ms. Treat testified that she spoke with Ms. Deyhle on August 8, 2016. Ms. Treat said Ms. Deyhle stated that she was unsure whether the victim got out of the car on her own at the stop sign. Ms. Treat said Ms. Deyhle claimed she had not seen whether the Defendant pulled the victim from the car.

Metro Nashville Police Detective Chris Locke testified that he worked in the Crime Stoppers Division. He said Crime Stoppers had a twenty-four-hours-per-day answering service. He was unaware of any reward having been paid relative to the present case.

The Defendant testified that he had known the victim since he was sixteen or seventeen years old. He described their relationship as "[f]riendly" and platonic in March 2015 and said he saw her daily. He said they were at Mr. Lamica's house "[h]anging out, getting high" in the late evening hours of March 18, 2015 or early morning hours of March 19, 2015. He said that, at the time, he lived at his mother's house and the victim lived in a hotel in Gallatin. He said he had stayed with Mr. Lamica before moving to his mother's house.

The Defendant testified that he did not sleep on the night of March 18, 2015. He said he was at Mr. Lamica's house on the morning of March 19 and that he had a Smith & Wesson .25-caliber handgun with him. He said Mr. Lamica had seen the gun previously. He said that on the morning of March 19, the gun was on his person and was not visible and that he did not tell anyone he had it. The Defendant said the victim called

-14-

him early that morning, asked if he "needed anything," and that they planned to purchase cocaine in Madison. He said someone dropped off the victim at Mr. Lamica's house.

The Defendant testified that he had called Ms. Deyhle to pick up the victim and him and that Ms. Deyhle drove them to Madison. He said he never asked or got out of the car to meet the drug dealer. He said the victim got out of Ms. Deyhle's car, got into another car to meet the drug dealer, and returned to Ms. Deyhle's car. The Defendant said they were in the parking lot where the drug deal took place for ten to fifteen minutes. The Defendant said he had gone with the victim on one previous occasion to purchase drugs from this dealer and was sure there had not been a total of three drug transactions.

The Defendant testified that, after the victim returned to Ms. Deyhle's car, he gave cocaine to the victim and Ms. Deyhle and that he broke up some cocaine and snorted it. He said he felt its effects within seconds. He said that the victim and Ms. Deyhle used cocaine and that the victim injected it while in the parking lot where the drug deal took place. He said that as they left, the victim asked for more cocaine. He said he did not want to give her more because it was unsafe to inject drugs in a moving car because the police might see it or conduct a traffic stop. He said that traffic was heavy on Myatt Drive and that he directed Ms. Deyhle to cut through a neighborhood.

The Defendant testified that he got out of the car at a stop sign because the victim kept asking for drugs. He said he was going to walk to "Thornton's" and call someone to pick him up. He said the victim got out of the car and asked him not to leave and to get into the car. He said he ignored her and was going to keep walking. He said that she kept telling him to give her drugs, that he turned around, and that she had a black revolver pointed at him. He said he rushed toward her and attempted to take the gun. He said he was a couple of feet from the victim. He said that he grabbed the gun, pointed it away from him, and began hitting the victim's head and face with his left hand. He said that the gun went off, that he jumped back and froze, and that he was in shock. He said Ms. Deyhle was out of the car and told him to get the gun and to get into the car. He said that he got into the car and that Ms. Deyhle picked up the gun and drove away. The Defendant denied that he threatened Ms. Deyhle or pointed a gun at her. He said that they went to Gallatin and that he threw his gun and the gun used in the shooting into water under a bridge. He said that disposing of the guns had been Ms. Deyhle's idea.

The Defendant testified that they went to Mr. Lamica's house for a few minutes in order for the Defendant to shower around 10:00 to 11:00 a.m. The Defendant said they went to "Leonard's" house. The Defendant said that they returned to Mr. Lamica's house later, that they used drugs, and that Mr. Lamica asked them to leave after seeing the

-15-

television news. The Defendant said they left Mr. Lamica's house around 6:00 p.m. and acknowledged he was "pretty intoxicated that day."

The Defendant testified that they went to Ms. Whitfield's house, arriving around 9:30 or 10:00 p.m. He said that they used drugs with Ms. Whitfield, that Ms. Deyhle left after using drugs, and that he and Ms. Harper went into a bedroom. He said he gave Ms. Whitfield a small amount of drugs twice. He said Ms. Whitfield became frustrated after he ran out of drugs. He said he never talked to Ms. Whitfield about "what happened." He did not know whether Ms. Whitfield and Ms. Harper discussed what happened.

The Defendant testified that he left Ms. Whitfield's house with Nick Julian and Ms. Harper and that he was arrested at a roadblock after leaving Ms. Whitfield's house. He said that Mr. Julian was Ms. Harper's boyfriend at the time. The Defendant said that he and Ms. Harper had a platonic friendship at the time, but he also stated they had been together for about two days at the time and were "[s]ometimes" romantically involved.

The Defendant agreed that he waived his rights and gave a statement to Detective Davis after the arrest. He agreed that he was untruthful when he told Detective Davis that they dropped off the victim at some apartments in Rivergate on the morning of March 19, 2015. When asked about his statement to Detective Davis that the driver had been a friend of the victim's, he said the driver had been a mutual friend of his and the victim's. He agreed that he had been untruthful when he told Detective Davis that he did not know the driver's name and when he said the car had been a green Dodge Stratus. He acknowledged that he had not been entirely truthful when he told Detective Davis that he was "not from down here" and was unfamiliar with Madison. He agreed that he had not been truthful when he said it was "just random" when Detective Davis asked how often the Defendant and the victim went to Madison to buy drugs. He also agreed that he had been untruthful when he told Detective Davis that the victim "met some guy at the mall" for the drug transaction.

The Defendant denied that he had contacted the victim multiple times by calling and sending text messages in the early morning hours of March 19, 2015. He said she called him and asked if he "needed anything." He agreed he removed the gun from the VCR tape case and took the gun with him that morning. He said he never asked to meet the victim's drug dealer and denied that he wanted to purchase directly from the dealer. He said that the only discussion of the victim's wanting a pill from him occurred on the way to the location of the drug transaction and that the victim's testimony to the contrary was not what happened. He denied that he thought the victim had been taking some of the cocaine from the purchases she made for him.

-16-

The Defendant denied that he pulled the victim from the car at the stop sign and said that she got out on her own. He agreed that she had asked repeatedly for cocaine and that she suddenly pulled out a gun and pointed it at him. He agreed he rushed toward her and said they were "tussling for the gun." He said she began screaming at him when he moved toward her. He said he "went for the gun" but could not get it away from her because she would not release her hold on it. He said he started hitting her face with his left hand and denied hitting the top of her head. He agreed that "somehow the gun turns around and fires into her cheek." He acknowledged he did not assist the victim after she was shot.

The Defendant testified that Ms. Harper had not been outside the car but said it was possible she had seen what happened. He disagreed with Ms. Whitfield's testimony about statements she claimed he had made to her about the shooting and said he had never "made any comments" to Ms. Whitfield. He denied that he threatened to "come after" Ms. Deyhle if she testified against him.

After receiving the evidence, the jury found the Defendant guilty of attempted first degree murder with serious bodily injury and employment of a firearm during the commission of or attempt to commit the dangerous felony of attempted first degree murder. At the sentencing hearing, the trial court imposed sentences of twenty-five years for the attempted first degree murder with serious bodily injury conviction, to be served at 85%, and ten years for the firearm offense, to be served at 100%. The sentences were imposed consecutively to each other and to the sentence in a Sumner County case. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his attempted first degree murder with serious bodily injury conviction. He argues that the evidence failed to establish the element of premeditation and that the State's proof failed to rebut his self-defense theory. The State responds that premeditation was established beyond a reasonable doubt and that the State rebutted the Defendant's self-defense theory through the proof of premeditation and in view of the jury's rejection of the Defendant's version of events. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201, 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the

-18-

manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Factors from which a jury may infer premeditation include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

For a conviction of first degree murder with serious bodily injury, the evidence must establish, in addition to the elements of the offense of first degree murder, that a victim suffered bodily injury that includes:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is twelve (12) years of age or less[.]

*Id.* § 39-11-106(a)(34) (2018). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(a)(2).

Viewed in the light most favorable to the State, the evidence shows that the Defendant was supposed to provide the victim with a pill for the victim's having arranged and completed the drug transaction with her drug dealer on the Defendant's behalf. The Defendant and the victim argued before and after the victim completed the drug transaction, and the Defendant did not provide the pill. In addition, the Defendant was angry because he could not meet the victim's drug dealer, and there was evidence he thought the victim might have been keeping some of the drugs she had been purchasing on his behalf. After the victim completed the drug transaction, the Defendant directed Ms. Deyhle's driving and had her go into a neighborhood, rather than on main roads. When they reached a stop sign, the Defendant got out of the car, opened the victim's car door, and pulled the victim from the backseat of the car. The victim was in the process of injecting cocaine with a syringe when the Defendant pulled her from the car, and a syringe was found at the scene. The Defendant hit the victim repeatedly on top of her head, produced a gun, and shot her in the face. The only evidence that the victim had a gun came from the Defendant's testimony, which the jury was within its province in discrediting. The Defendant told the victim, "[Y]ou'll quit being a smart b----." Rather than assisting the victim, as he might do if the shooting had been accidental, he got into Ms. Deyhle's car and fled the scene. The Defendant later told Ms. Whitfield that he would have shot the victim two more times if someone had not come outside. Ms. Deyhle said the Defendant had been calm immediately before the shooting and that he was calm and slightly panicked after it. Nevertheless, he had the presence of mind to direct Ms. Deyhle to a bridge, where he disposed of the gun he used to shoot the victim by throwing it from the bridge.

With regard to the element of premeditation, we note the evidence that the Defendant armed himself on the morning of the shooting and that the Defendant was angry with the victim and had a verbal exchange with her about a pill shortly before the shooting. Nevertheless, the Defendant was calm after the drug transaction and directed Ms. Deyhle to drive into a neighborhood, rather than on main roads, as they left the location of the drug transaction. When Ms. Deyhle stopped at a stop sign, the Defendant got out of the car, pulled the victim from the car as she was injecting cocaine, and assaulted the unarmed victim by hitting her head with his fist. Although the victim fell to the ground during the assault, the Defendant continued hitting her, shot her at close range in the face, and said, "[Y]ou'll quit being a smart b----," before fleeing the scene without rendering aid to the victim. The Defendant disposed of the gun after the shooting, and he told Ms. Deyhle and Ms. Harper that he would retaliate or have someone else retaliate on his behalf if they "said anything." From the evidence, a rational jury could conclude that the Defendant shot the victim after reflection and judgment and that he was free of excitement and passion when he shot her. *See Nichols*, 24 S.W.3d at 302.

The evidence showed, as well, that the Defendant intended to cause the victim's death by shooting her in the face at close range. He failed to render aid or obtain assistance for the injured victim, with whom he had been friends previously. This evidence of his conduct immediately after the shooting shows both that he intended to kill the victim and that he thought her death would result without further conduct on his part. Finally, the evidence showed that the victim received serious bodily injury from the shooting. The evidence is sufficient to support the attempted first degree murder with serious bodily injury conviction.

In concluding that the evidence is sufficient to support the convictions, we have rejected the Defendant's contention that the State's proof failed to rebut his self-defense theory. In Tennessee, a person acts in self-defense who

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2014) (amended 2016, 2017). Once a defendant has raised sufficient facts to support a finding that he acted in defense of self, "The state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

The Defendant testified that he directed Ms. Deyhle to drive through the neighborhood to avoid heavy traffic, that he got out of the car at the stop sign because the victim kept asking for drugs, and that he was going to call someone to pick him up. He claimed that he began walking away, that the victim followed him from the car, that she continued to demand drugs, and that they struggled after she produced a gun and pointed it at him. The State offered evidence, however, that the Defendant got out of the car, that he pulled the victim from the car while she was injecting drugs, that he initiated the assault that culminated in the shooting, and that he had the only weapon involved. In addition, the Defendant claimed to have disposed of both his gun and the gun the victim

-21-

produced, even though he claimed the victim's gun was the one that fired.  A rational jury could conclude that if the victim had been shot with a gun she possessed, the Defendant would have had no reason to dispose of either his gun, which he claimed had not been fired, or the victim's gun, which would have supported his claims that she had pointed a gun at him and that they had struggled for control of it.  The State produced sufficient evidence to negate the self-defense theory, and the jury was free to discredit the Defendant's testimony and credit that of the State, thereby rejecting self-defense.

The Defendant is not entitled to relief on this basis.

## II

## Prior Bad Act Evidence

The Defendant contends that the trial court erred in admitting evidence of two prior drug purchases the victim made for the Defendant.  He contends that this was prior bad act evidence that should have been excluded pursuant to Tennessee Rule of Evidence 404(b).  The State contends that the court did not abuse its discretion in admitting the evidence.  We agree with the State.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait.  Tenn. R. Evid. 404(b).  Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake.  *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).  Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998)

The record reflects that the trial court conducted a hearing as required by Rule 404(b). In determining that the evidence was admissible, the court stated:

> [T]here are several things here. One of which is it goes to the reasons for the shooting and the relationship that she had purchased these drugs on three other occasions, the weight – that he would weigh it out, about the pattern of which it was done, and then what happened on this occasion. I'm allowing that – not only that pursuant to *Gilliland* just the whole context of the – it otherwise would not make any sense at all. So in terms of establishing the intent in this case, absence of mistake or accident, all that, I'm going to allow it in. I am however going to tell the jury that they cannot consider this except for the limited purposes of a complete story of the crime and whether or not there was a motive and his intent. So complete story, motive, and intent. I'm going to advise the jury they can't consider it for any other reason. He's not on trial for that. So I'm going to allow it.

The Defendant argues that the trial court did not substantially comply with Rule 404(b) because it did not make findings (1) that the probative value of the prior conduct outweighed the danger of unfair prejudice and (2) that clear and convincing evidence existed that the prior conduct occurred. The record reflects that the issue of the admissibility of the evidence was raised by the State, which filed a motion to introduce evidence of prior illegal drug activity. The motion stated that the evidence of the Defendant's prior involvement in illegal drug activity was admissible for "other purposes" pursuant to Rule 404(b) because it was relevant to corroborate the Defendant's statements to Ms. Whitfield regarding his motive for shooting the victim because she had been taking cocaine and money from the Defendant.

During a jury-out hearing, the victim testified that she had completed three drug transactions for the Defendant within a two-week period, one of which culminated in the shooting. She said their arrangement was for the Defendant to provide her with cash to

-23-

make the purchase and with a morphine pill as compensation for her participation. She said the procedure they followed and the drug dealer from whom she purchased the drugs were the same each time. She said the Defendant weighed the drugs each time she gave them to him. She said the Defendant had been angry both on the day of the second drug transaction and on the day he shot her because the drug dealer would not sell directly to the Defendant. She said that the Defendant attempted to approach the drug dealer during the second transaction but that the dealer was going to leave, and the Defendant let her complete the transaction without the Defendant's meeting the dealer.

The Defendant's primary concern with the evidence at the jury-out hearing related to his Confrontation Clause rights relative to the drug dealer, who was not a trial witness and who was not identified by name, rather than to the factual accuracy of the occurrence of the drug transactions. Nevertheless, the court recognized that Rule 404(b) controlled the issue of the admissibility of the evidence and endeavored to address it. Although the court did not explicitly address the weight of the probative value of the prior drug transactions as being greater than the danger of unfair prejudice, the court accurately identified the issue as "whether or not [the evidence is] being introduced as conformity to character or is it for some other issue." The court also observed, "The material issue is what was the motive behind this. Was it an accident, mistake, or just what was it about." The court said that the jury would be cautioned regarding the limited purposes for which it could consider the evidence of the prior drug transactions and that the jurors would be told they could not consider the evidence for any other purpose, noting, "He's not on trial for that." This shows the court's weighing of the probative value of the evidence for the specific issues it identified against the danger of unfair prejudice. Further, the occurrence of the prior drug transactions was not disputed and, although the court did not make an explicit finding on the record, it accepted as credible the evidence of the victim's prior drug transactions on behalf of the Defendant. We conclude that the trial court substantially complied with the requisites of Rule 404(b). We will review its ruling for abuse of discretion. *DuBose*, 953 S.W.2d at 652.

The jury heard the victim testify that she had previously purchased drugs for the Defendant. The trial court cautioned the jury that it was going to hear evidence of criminal activity, that it could consider this evidence "for the complete story of what happened," and that it could not consider the proof "as evidence of a character that [the Defendant] committed this crime, only as context, intent, and motive." Thereafter, the victim testified that she completed two previous drug purchases on the Defendant's behalf and explained that they would get together and that he would call someone to take them to the apartment complex in Madison where she would meet the drug dealer. She said that on the second occasion, the Defendant got out of the car and approached the car she and the drug dealer were in, that the drug dealer "was going to leave," and that the Defendant was angry he did not get to purchase the drugs himself. Ms. Whitfield testified, albeit after the trial court admitted the evidence of the prior transactions, that the

Defendant told her he thought the victim had been stealing drugs and money from him.[2] During the jury instructions at the close of the proof, the court advised the jury that it was limited to considering evidence of the Defendant's prior crimes solely for completion of the story, motive, and intent relative to the crimes on trial. The court admonished the jury that it could not consider the prior crimes evidence as proof the Defendant had a disposition to commit crimes such as those on trial.

The evidence of the prior drug transactions was relevant to the State's proof of the Defendant's motive to shoot the victim, which in turn was probative of his criminal intent to commit the offense. The prior dealings of the parties were relevant and probative to show the arrangement between the victim and the Defendant regarding drug transactions and the reason why the transaction that immediately preceded the shooting might have resulted in the Defendant's shooting the victim. With regard to the danger of unfair prejudice from the admission of evidence of two prior drug transactions, we note that this case was replete with evidence of drug activity. The Defendant, the victim, Ms. Deyhle, and Ms. Whitfield all acknowledged using drugs, and a drug transaction immediately preceded the shooting. The trial court noted that the jury was aware that the participants in the relevant events were involved in drug activity, and the record supports a determination that the danger of unfair prejudice from evidence of additional drug transactions did not outweigh its probative value. In addition, the Defendant was not charged with a drug offense in the present case.

With regard to contextual background evidence for which admission is sought pursuant to Rule 404(b), our supreme court has said:

> when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000). In the present case, the trial court referenced *Gilliland* and stated that the evidence of the prior drug transactions was necessary and that, without it, the proof "would not make any sense at all." Thus, the

---

[2] Although this evidence was admitted after the State introduced the evidence of the prior drug transactions, Ms. Whtifield's anticipated testimony was known to the trial court and the parties at the time the court ruled on the admissibility of the prior transaction evidence. As we have stated, the State's pretrial motion in limine referenced Ms. Whitfield's pretrial statement to Detective Davis about the Defendant's statement to her.

court considered the evidence necessary to avoid creating a chronological or conceptual void in the State's case and that such a void was likely to significantly confuse the jury as to the material issues or the evidence. As we have stated, understanding the parties' prior drug transactions was relevant and probative of the State's theory that the Defendant shot the victim due to his dissatisfaction with their dealings in the two prior and the current drug transactions. As we have stated, the evidence showed that many of the witnesses, including the Defendant, were involved in drug activity, aside from the two prior drug transactions the victim completed for the Defendant. The Defendant was on trial for an attempted homicide and possession of a weapon, not for a drug offense. Thus, the danger of unfair prejudice from the evidence did not outweigh its probative value.

The record reflects that the trial court permitted the evidence after consideration of the relevant facts and legal principles and that its determinations are supported by the record. The court gave appropriate limiting instructions to the jury regarding the permissible uses of the evidence. The court did not abuse its discretion in admitting the evidence. The Defendant is not entitled to relief on this basis.

### III, IV, & V

### Evidentiary Issues Related to Ms. Whitfield's Testimony

The Defendant raises related issues pertaining to Ms. Whitfield's testimony. First, he contends that the trial court erred by failing to strike Ms. Whitfield's direct examination testimony that she previously stated to Detective Davis that the Defendant had said he wished he had shot the victim two more times and the reason he did not. Next, he contends that the court erred during redirect examination in admitting Ms. Whitfield's prior police statement on the basis that it was a prior consistent statement. Finally, he contends that the court erred in limiting cross-examination of Ms. Whitfield about her status as a probationer and her prior work as a paid police informant.

### A.    Factual Background

The record reflects that before Ms. Whitfield testified, the defense announced its intention to the trial court to cross-examine Ms. Whitfield about the fact that she was on probation in order to show "motivation she may have to testify other than to tell the truth." The court ruled that cross-examination about Ms. Whitfield's status as a probationer would not be permitted but that she could be cross-examined about her prior convictions and, relative to bias, about whether she had been made any promises by the State for her testimony and about her failure to appear to testify at the Defendant's preliminary hearing.

Notwithstanding its ruling, the trial court permitted the defense, at a later time, to make an offer of proof. During this jury-out hearing, Ms. Whitfield testified that she was currently serving an eight-year Sumner County sentence on probation. She agreed that the terms of probation required her to follow the law, that failing to attend the Defendant's trial would not be following the law, and that she could be found in violation of probation if she failed to attend the trial. She agreed that she would not want to testify inconsistently with what she had said previously to Detective Davis and that if she did, this would be evidence she had previously made a false report, which she agreed was a felony. She agreed that her "ability to stay out of prison" depended upon her presence at the Defendant's trial and "saying the same thing that [she] said before." She said she would be present for the Defendant's trial without regard to whether she was on probation. When asked if she was subpoenaed for the Defendant's preliminary hearing, she said she had not been served and had not received a telephone call. She acknowledged, however, that she had been aware the State had tried to reach her by calling Ms. Harper and that she had been aware the State wanted her to testify at the preliminary hearing. She acknowledged that she did not attend the preliminary hearing. She stated that the Davidson County prosecutor in the Defendant's case had not been in contact with the Sumner County prosecutor in the cases for which she was on probation relative to arranging any "special favor" for her testimony.

At the trial, Ms. Whitfield testified on direct examination about the conversation she and the Defendant had about the shooting. She said the Defendant stated that after he shot the victim, he got into Ms. Deyhle's car and that "they took off." Ms. Whitfield stated that the Defendant said he looked behind him, saw two people running on the sidewalk, and "knew at that given point he should have put two more bullets in her." When asked the reason the Defendant decided not to shoot the victim again, Ms. Whitfield said, "Because someone was running after or had hollered stop."

Ms. Whitfield testified that she gave a handwritten statement to the Westmoreland Police and left the police station but returned later and spoke to Detective Davis. She said she told the Westmoreland Police and Detective Davis the same information to which she had testified previously.[3]

The prosecutor asked Ms. Whitfield to review a document, and the defense did not object.[4] The transcript reflects the following:

---

[3] Although the prosecutor did not define what he meant by "previously," we infer from the context that he was referring to Ms. Whitfield's direct examination. Other evidence shows that she did not testify at the preliminary hearing.

[4] Although this document was not specifically identified on the record, we conclude from Ms. Whitfield's acknowledgment of her handwriting that it was her handwritten statement to the Westmoreland Police, not the transcript of her recorded statement to Detective Davis.

Q.    Okay.   I want to pass you a document and ask if you recognize it.   And if you could just review the back page, please. (Document passed.)

A.    Uh-huh.

Q.    Okay.  Is that your handwriting?

A.    It is.

Q.    And did you review – I'm not asking you to read it into the mike, but just read it to yourself.

A.    (Witness complies.)  Okay.

Q.    You read the top back page?

A.    I did.

Q.    In terms of what Mr. Ward told you the reason was he didn't fire two more shots does that refresh your memory of what he said?

A.    Just that he was –

[DEFENSE COUNSEL]:   Asked and answered, Judge.  She already testified to this.

THE WITNESS:     That he –

[PROSECUTOR]:   I'm asking to refresh her memory.

THE COURT:       Okay.

[DEFENSE COUNSEL]: Her  memory  doesn't  need  to  be refreshed.

THE COURT:       Overruled.  Go ahead.

THE WITNESS:     Someone walked outside.  Yeah, he had seen somebody coming, so he jumped in the car.

-28-

Q.     (By [the prosecutor])     Where did they walk outside from?  I mean, where did they walk to?

A.     It just says, was going to put the other two bullets in her, but someone walked outside so he jumped into the car and they took off.

[DEFENSE COUNSEL]:   Judge, I move to strike that.  It's hearsay and there was evidence that she –

. . .

THE COURT:     Now, what is your objection?

[DEFENSE COUNSEL]:  One, he's refreshing a memory that there's no evidence it needs to be refreshed.  She has not said I can't remember, I don't know, anything else.  And now she's reading into the record hearsay about her statement about what his statement was.

THE COURT:     Okay.  Why don't you ask again would that refresh your memory about what he actually did say and then have her – take it away from her, and do it that way.

[DEFENSE COUNSEL]:   She's not said she doesn't remember.

THE COURT:     Do the foundation if you're going to do that.

DEFENSE COUNSEL:     She already testified to what was said.

THE COURT:     Okay.  He can ask her.  And if she can – if it was written down and if she – did she what [sic] exactly she told the police, does that help her to know exactly what she did.  And then you can say without getting into – did that refresh your memory.  If it doesn't, take it away from her.

[PROSECUTOR]:  Right.  Technically I can ask her about a prior inconsistent statement as well.

THE COURT:     Yes.

[PROSECUTOR]:  I could do it like that.

THE COURT:     All right.

-29-

[PROSECUTOR]:   I prefer to do it that way.

[DEFENSE COUNSEL]:   What is she saying different than what she just said?

[PROSECUTOR]:   About walking out on the porch, walking outside.  I'm actually done – we don't have to get back into it unless you want to.

The court asked the prosecutor if he intended to ask more questions about the document the witness had been shown, and the prosecutor stated that he did not.

On cross-examination, the defense challenged Ms. Whitfield's credibility by inquiring about her prior convictions and whether she had received or had learned information about the shooting from the Internet and had provided it to the police with the hope of receiving a financial reward.  She acknowledged that she had a television at her house but explained that she did not have cable or "basic channels" and could only watch movies.  She agreed she volunteered to Detective Davis that she had a "flip phone" and could not access Facebook and that she was not "up to date on what was going on."

The defense asked Ms. Whitfield if she told Detective Davis that the Defendant had stated his initial plan had been to rob the victim, and Ms. Whitfield responded that she had said this.  She agreed that this should be in her recorded statement to Detective Davis but said she did not think it was in her written statement to the Westmoreland Police.  The defense provided her with the transcript of the recorded statement, which she reviewed, and she acknowledged, "I don't see it in here unless I'm overlooking it. . . . Yeah, I don't see it."

At a bench conference during cross-examination, the defense sought permission to question Ms. Whitfield about alleged occasions on which she had received cash from the Westmoreland Police in exchange for information about criminal activity in the months before the victim's shooting.  The trial court ruled that the defense could question Ms. Whitfield about whether she received money from Crime Stoppers or the police related to the present case but that inquiry regarding any prior transactions was irrelevant and inadmissible.  Ms. Whitfield then testified before the jury that she had not sought or received any benefit from the police related to this case.

On redirect examination, the State questioned Ms. Whitfield about her prior statements to the Westmoreland Police and to Detective Davis.   She acknowledged her prior statement that the Defendant told her about his suspicions that the victim had been taking drugs from him and replacing them with baking soda or baking powder.  She

-30-

agreed that she had stated previously that the Defendant had said relative to the events on the day of the shooting that, when the victim had been out of Ms. Deyhle's car to complete the drug transaction, the Defendant had told "the driver" to be sure the Defendant had "the dope" and to "hit the neighborhood." The defense objected without stating the basis for the objection, and the trial court overruled the objection. After additional questions, defense counsel asked to approach the bench. Before counsel stated his concern, the court said that the State was permitted to introduce Ms. Whitfield's prior consistent statement, noting that the statement had been made "prior to the time you [defense counsel] alleged that she is inconsistent or that she had a motive to lie. The court explained, "You're [defense counsel] saying that her motive to lie came when the police gave her money or she's getting some sort of benefit. That came after. This is what she told the police originally, therefore, he [the prosecutor] gets to put a prior consistent statement in." The prosecutor read portions of the statement, which were acknowledged by Ms. Whitfield as follows:

> Q. . . . But I – just a few minutes ago they were talking about it again, and evidently she was in the backseat and he got out of the front seat. And she had locked the back door, and he was telling her to get out. And she told the driver to unlock the door. When she unlocked the door, he started – he pulled her out by the hair of [sic] something, started pistol whipping her is what he said. And then she hollered, Rob, don't do this. And that's when he done like an upper cut, this is just like what he said he was fixing to pull – he said she was standing up, and she looked at him. He seen the blood, and she just fell over. Do you remember saying all that to Detective Davis?
>
> A. I do.
>
> Q. He said when she fell over, she fell slow and hit her head and hit the road. He said I was – I had two more bullets in my gun and I about – I was going to put the other two bullets in her, but somebody was coming outside. And I jumped in the car, and we took off. Do you remember telling Detective Davis that?
>
> A. I do.
>
> Q. And you said, I was – and I was just dumbfounded. Like at first, I'm like whatever, you know, I've never been subject to something like this, and I was just kind of like whether the dude is making this up, you know. Do you remember saying that?
>
> A. I do.

-31-

Q. And in the statement you made just a couple of hours before to Westmoreland police, do you recall – in fact, you wrote that statement out?

A. I did.

Q. I went to him, and I talked to him and told him to tell me what happened. He stated that Valerie, himself, Nikki, and another woman were going to pick up some powder through Valerie's people. But he said that Valerie had owed him some money because she was taking some of his money. Do you remember saying that?

A. I do.

Q. Now, owed him some money and taking some of his money, did that relate to what you said in the other statement about the cocaine?

A. Yes.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

Q. [By the Prosecutor] Can you explain those two statements:

A. To me at the time money, drugs, dope, cocaine, money is cocaine. I mean, I was an addict so that's how I . . . [ellipsis in original]

Q. You continue on, Valerie was yelling at him, calling him a childish b---- and he was stupid. When Valerie got out of the vehicle to get the dope, he stated that he told the driver that when Valerie got back into the car for her to hit the neighborhood, so she did. At a stop sign he got out and tried to get Valerie out of the car, but she locked the door. But the driver unlocked it. He pulled Valerie out of the car by her hair, pistol whipped her, and she yelled, Robert, don't do this. And he put the gun to her head and she looked into his eyes and fell over slowly. He said he had two more bullets in the gun and was going to put the other two in her, but someone walked outside. So he jumped in the car, and they took off.

And that's what you – that's the statement to the Westmoreland police?

-32-

A.     Yes, sir.

## B.     Failure to Strike Direct Examination Testimony

We begin our analysis with the Defendant's contention that the trial court erred by failing to strike Ms. Whitfield's direct examination testimony that she previously told the police that the Defendant had said he wished he had shot the victim two more times and his reason for not doing so. He argues that this evidence was inadmissible hearsay and that the court erred in permitting the State to refresh the witness's recollection with the document and in failing to strike her testimony about the document's contents. The State contends that any error in the timing of the admission of the evidence on direct examination was harmless because the statement was used properly on redirect examination to rehabilitate Ms. Whitfield's credibility after the defense attacked it on cross-examination.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

As relevant to this appeal, Tennessee Rule of Evidence 612 states, "If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Relative to the procedure to be followed, the Advisory Commission Comments provide, "Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory." Tenn. R. Evid. 612, Advisory Comm'n Cmts.; *see State v. Price*, 46 S.W.3d 785, 814 (Tenn. Crim. App. 2000).

The record does not reflect that the State established that Ms. Whitfield's memory needed to be refreshed with the transcript of her recorded statement to Detective Davis. We note, as well, that Ms. Whitfield testified as to the contents of the statement itself, rather than from her memory after reviewing the document. We conclude that the

procedure for refreshing a witness's recollection was not followed. *See Price*, 46 S.W.3d at 814 (holding that the trial court erred by allowing two witnesses to testify while retaining the writings that were used to refresh their recollection, but concluding that the error was harmless); *State v. Dishman*, 915 S.W.2d 458, 461 (Tenn. Crim. App. 1995) (concluding that error existed because the witness, after having her recollection refreshed with a writing, retained the writing and continued to testify from it, but concluding that the error was harmless).

We also conclude that Ms. Whitfield's testimony about the contents of the statement, as opposed to her recollection of prior events after having refreshed her recollection by reviewing the statement, was hearsay. *See* Tenn. R. Evid. 801, 802. As we have noted, after reviewing the statement, Ms. Whitfield testified, "It just says, was going to put the other two bullets in her, but someone walked outside so he jumped into the car and they took off." This testimony was hearsay because it was evidence of the contents of her prior statement and was offered to prove the truth of the matter asserted. *See* Tenn. R. Evid. 802(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The trial court erred in denying the Defendant's motion to strike this hearsay testimony.

The Defendant contends that a new trial is required. The Defendant argues that Ms. Whitfield testified initially that the Defendant had recounted having thought only after he was leaving the scene about firing additional shots but that her testimony about the statement suggested the Defendant had intended to fire more shots but had been deterred by the presence of others. As we have stated, Ms. Whitfield testified on direct examination that the Defendant said he looked behind him, saw two people running on the sidewalk, and "knew at that given point he should have put two more bullets in her." When asked the reason the Defendant decided not to shoot the victim again, Ms. Whitfield said, "Because someone was running after or had hollered stop." Later, when referring to the written statement, Ms. Whitfield testified, "It just says, was going to put the other two bullets in her, but someone walked outside so he jumped into the car and they took off."

We do not view Ms. Whitfield's direct examination testimony about the Defendant's recounting of the relevant events to be inconsistent with her testimony about the contents of her prior police statement. At most, they differ in the degree of detail offered. Both statements provide evidence of the Defendant's intention to kill the victim. In her testimony, Ms. Whitfield said the Defendant knew he should have shot the victim two more times, indicating his intent had been to kill the victim. Relative to the prior police statement, Ms. Whitfield stated the Defendant had said he "was going to" shoot the victim two more times but did not because of the presence of another person. Thus, both Ms. Whitfield's testimony about her conversation with the Defendant and her testimony

-34-

about her prior statement recounting that conversation are probative of the Defendant's intent to kill the victim. In addition, the record reflects that the prosecutor was attempting to highlight what he perceived to be an inconsistency between Ms. Whitfield's testimony that the Defendant did not shoot again because "someone was running after or had hollered stop" and her prior statement "[a]bout walking out on the porch, walking outside." Because the erroneous admission of the contents of the prior police statement was largely cumulative of Ms. Whitfield's testimony, any prejudicial effect was inconsequential.

The State presented abundant evidence of premeditation, aside from Ms. Whitfield's prior police statement regarding the Defendant's wish he had fired two additional shots. As we discussed in our review of the sufficiency of the evidence in section I above, the evidence showed that the Defendant armed himself on the morning of the shooting, that he was angry with the victim and had a verbal exchange with her about a pill shortly before the shooting, that he was calm after the drug transaction and directed Ms. Deyhle to drive into a neighborhood, rather than on main roads, that he got out of the car at a stop sign, that he pulled the victim from the car and assaulted her, that he continued hitting her after she fell, that he shot her at close range in the face and said, "[Y]ou'll quit being a smart b----" that he fled the scene without helping the injured victim, that he disposed of the gun after the shooting, and that he threatened Ms. Deyhle and Ms. Harper with harm if they "said anything."

Upon review, we conclude that the trial court's error in admitting Ms. Whitfield's prior police statement during her direct examination was harmless. *See* T.R.A.P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The Defendant is not entitled to relief on this basis.

### C.    Admission On Redirect Examination as a Prior Consistent Statement

Next, the Defendant contends that the trial court erred during redirect examination in admitting Ms. Whitfield's prior police statement on the basis that it was a prior consistent statement. The State counters that the Defendant waived this issue by failing to raise it in the trial court and that, in any event, the prior statement was properly used to rehabilitate Ms. Whitfield after her credibility was attacked on cross-examination.

We begin by rejecting the State's argument that the issue is waived. The record reflects that defense counsel objected by stating, "Her memory doesn't need to be refreshed, and that the court responded, "Overruled." In addition, the motion for a new trial alleged the following:

-35-

The Court Erred by Admitting, Essentially in its Entirety, Felicia Whitfield's Hearsay Statement to Police as a Prior Consistent Statement. Even if Felicia Whitfield's Prior Statements Had Been Properly Admitted, the Court Erred by Not Instructing the Jury on their Limited Purpose, which had the Effect of Admitting the Statement's [sic] as Substantive Evidence.

We will consider the Defendant's issue on its merits.

"Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)). As a general rule, evidence of prior consistent statements is inadmissible to rehabilitate an impeached witness. *Braggs*, 604 S.W.2d at 885. Three exceptions exist. First, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988); *see State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998). In this situation, the prior consistent statement is permitted to show that the witness testified consistently with a prior statement made at a time when the witness had no influence or motive to lie. *See State v. Sutton*, 291 S.W. 1069, 1070 (1927). In order to be admissible, the witness's "testimony must have been assailed or attacked to the extent that the . . . testimony needs rehabilitating." *Hodge*, 989 S.W.2d at 725. If admitted for the purpose of rehabilitating a witness, the statement is not hearsay because it is not admitted to prove the truth of the matter asserted. Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01[9] (6th ed. 2011).

Second, a prior consistent statement may be admitted after a witness has been impeached with a prior inconsistent statement that suggests the witness fabricated testimony or testified based upon faulty recollection. *See State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). In this situation, a statement made by the witness before the inconsistent statement and which is consistent with the witness's trial testimony is admissible to rehabilitate the witness's credibility. *Id.*

Third, a prior consistent statement may be admitted when a witness is asked specific questions that make a prior statement appear to be inconsistent with the witness's trial testimony, the rationale being that the prior statement is admissible to place the apparently inconsistent statement into proper context. *See State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990).

A trial court must, upon request, instruct the jury that the prior consistent statement cannot be used for the truth of the matters contained therein. *See* Tenn. R.

Evid. 105; *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); *see also Braggs*, 604 S.W.2d at 885; *see also State v. Herron*, 461 S.W.3d 890, 904-05 (Tenn. 2015) (stating that, although prior consistent statements are generally inadmissible, they may be admitted to rehabilitate the credibility of a witness who has been cross-examined about having given testimony that contained "recent fabrication" or "deliberate falsehood"); *Hodge*, 989 S.W.2d at 725 (stating that prior consistent statements may be admitted, in limited circumstances, for rehabilitative purposes); *Braggs*, 604 S.W.2d at 885 (stating that a prior consistent statement may not be considered as substantive evidence).

As we have noted, the defense attacked Ms. Whitfield's credibility during cross-examination. The Defendant argues on appeal that the State was not entitled to use Ms. Whitfield's prior statements to rehabilitate her credibility because her prior consistent statements were not made before her alleged motive to lie arose. *See State v. Charles Sherman Thaxton*, No. E1999-02091-CCA-R3-CD, 2000 WL 1499440, at *4 (Tenn. Crim. App. Oct. 10, 2000) (to the extent that the defendant attacked the victim's testimony as an original fabrication, rather than a recent fabrication, the victim's prior consistent statement was inadmissible, but to the extent the defendant impeached the victim's testimony with a prior inconsistent statement, the court properly admitted the victim's consistent statement made before the inconsistent one). He argues that his cross-examination was targeted to show Ms. Whitfield's motivation to lie from the beginning of her interaction with the police, after having searched the Internet for details of the shooting, and that she was motivated to lie because she had financial difficulties and wanted a reward for providing the police with information. Thus, he argues, the prior consistent statement should not have been admitted because all of her statements were made after the motive to lie arose.

Upon review, we conclude that the trial court erred in permitting the State to use Ms. Whitfield's prior statements as rehabilitative evidence. In admitting the evidence, the court reasoned that the defense was "saying her motive to lie came when the police gave her money or she's getting some sort of benefit. That came after. This is what she told the police originally, therefore, [the State] gets to put a prior consistent statement in." The record reflects that the defense sought permission to cross-examine Ms. Whitfield about (1) her incentive to testify consistently with her prior police statements in order to remain in good standing with the terms of her probation and (2) about her prior knowledge of the possibility of receiving money from the police in exchange for information about criminal activity, but that the court ruled that the defense could not inquire about these matters. The court limited the defense to questioning about Ms. Whitfield's prior convictions and about whether she had received any money from the police for information relative to the present case. The record reflects that Ms. Whitfield denied receiving money from the police in connection with this case, and no evidence suggested otherwise. Similarly, the court excluded evidence that she was on probation,

and no evidence that was before the jury suggested she had testified falsely in order to remain in good standing with the terms of probation. In addition, the record reflects that she had researched the facts of the shooting before her first police statement, and as such, there is no argument that she had changed her account to Detective Davis as a result of having researched the facts online after speaking with the Westmoreland Police.

The trial court's error was compounded by the Defendant's failure to request a limiting instruction regarding the use of the prior statement and by the court's failure to give the instruction. *See* Tenn. R. Evid. 105 ("When evidence which is admissible . . . for one purpose but not . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."); *Herron*, 461 S.W.3d at 905 (stating that the trial court must give a limiting instruction "upon request" as to the proper use of the evidence). The effect was that the jury had the prior statement before it as substantive evidence. *See State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000) ("A trial court . . . generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection. A party may consent to the admissibility of evidence which is otherwise prohibited by the Rules, so long as the proceedings are not rendered so fundamentally unfair as to violate due process of law."); *cf. State v. Jarvis Sherrod and Antonio Dodson*, No. W2015-02022-CCA-R3-CD, 2017 WL 1907723, at *11 (Tenn. Crim. App. May 9, 2017) (holding that a defendant who objected to the admission of prior consistent statements but failed to request a limiting instruction had waived the issue of the court's failure to give the limiting instruction), *perm. app. denied* (Tenn. Sept. 22, 2017). The Defendant did, however, raise the lack of a limiting instruction as an issue in the motion for a new trial.

As we stated in subsection B above, the State was improperly permitted to refresh Ms. Whitfield's recollection of her prior police statement during direct examination. The contested issue in the case was whether the shooting was premeditated and intentional or whether it was done in self-defense. In this regard, Ms. Whitfield's improperly admitted prior statements were largely cumulative of her testimony. Perhaps more significantly, the State presented abundant evidence of premeditation other than that contained in the prior police statements. We have recounted that evidence in our analysis of the sufficiency of the evidence and of the improper use of the prior statement on direct examination, and we will not belabor the point by reciting that evidence again. The jury was aware of Ms. Whitfield's prior convictions and of her drug use during the time of the relevant events. We conclude that the erroneous admission of the prior statements as substantive evidence was harmless. *See* T.R.A.P. 36(b). The Defendant is not entitled to relief on this basis.

**D.** **Limits on Cross-Examination**

The Defendant contends that the trial court erred in limiting cross-examination of Ms. Whitfield about her status as a probationer and her prior work as a paid police informant. The State responds that no evidence shows that Ms. Whitfield sought anything in exchange for her police statements and that the court did not err in limiting cross-examination regarding her probation status and any previous payments she might have received from the police for information about criminal activity.

"The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000); *see Washington v. Texas*, 388 U.S. 14, 119 (1967). Likewise, due process protects a criminal defendant's right to confront and cross-examine witnesses. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.' " *Dishman*, 915 S.W.2d at 463 (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012). In that regard, a court may limit cross-examination due to such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. 1994).

**1.** **Probation**

The Defendant argues that he should have been allowed to cross-examine Ms. Whitfield about the fact she was on probation because her status as a probationer could demonstrate bias in favor of the State. He reasons that a jury might conclude that Ms. Whitfield's testimony "was at least partially motivated by fear of going to prison if she did not cooperate by testifying in a way that pleased the State."

In denying the Defendant's request, the trial court observed:

The mere fact that she's on probation, that in and of itself does not have any value other than what the conviction is. If she didn't show up for court, she could be arrested whether she's on probation or not. It doesn't have anything to do with it, [defense counsel]. She said she wasn't subpoenaed for the preliminary hearing. That's it. But you are also making the implication that the only reason she's testifying the way she is is because that's what she previously said. Well, there's no evidence in the record of that. It could be that that's what she would be testifying to because that is

what she saw or heard happen. And it is consistent with that because that's what she saw or heard happen.

. . . .

There's nothing – no factual basis otherwise in the record for that.

Upon review, we conclude that the trial court did not abuse its discretion in limiting cross-examination of Ms. Whitfield in this regard. As we have stated, the defense was allowed to impeach her credibility by inquiring about her prior convictions for felony failure to appear and theft, crimes which the jury might conclude reflected adversely upon her truthfulness. *See* Tenn. R. Evid. 609 (permitting impeachment of a witness with evidence of conviction of certain crimes). The defense was also allowed to ask her whether she had received any benefit from the State in exchange for her cooperation in the Defendant's case. Although she denied that she had received any benefit, the Defendant was afforded the opportunity to inquire about a matter which might demonstrate bias. *See* Tenn. R. Evid. 616 (permitting cross-examination regarding bias in favor of or prejudice against a party). Thus, the defense was allowed to cross-examine Ms. Whitfield about matters which might provide impeachment evidence. There was no evidence she had any incentive to testify untruthfully in order to be consistent with false prior statements in order to remain on probation, Cross-examination questions in this regard would have injected speculation and confusion into the issue of her credibility. *See Reid,* 882 S.W.2d at 430. The Defendant has not shown that the court's ruling unreasonably restricted his right to cross-examine the witness. *See State v. Reid*, 213 S.W.3d 792, 839 (Tenn. 2006) ("This court will not disturb the limits placed upon the cross-examination by the trial court, unless the trial court has unreasonably restricted the right.").

### 2. Prior Payments Received as an Informant

The Defendant argues that the trial court erred by ruling that he could not cross-examine Ms. Whitfield about her prior work as a police informant. He argues that this evidence would have shown Ms. Whitfield knew when she made the statements implicating the Defendant that the police would pay for information about criminal activity. He contends that this evidence was admissible pursuant to Tennessee Rule of Evidence 616, which permits impeachment with evidence of bias or prejudice.

Defense counsel alleged in the trial court that Ms. Whitfield had received money for providing the police with information about criminal activity in the months preceding the shooting. In support of the motion for a new trial, the defense submitted an affidavit of Ms. Whitfield, in which she stated that she had completed two drug purchases for a Sumner County detective and that she had received $100 per transaction. She stated that she had approached the detective in August 2014 seeking to work as a paid informant after her ex-husband had entered into such an arrangement with the detective. She stated

she approached the detective because she needed money for food and housing for her children and that she did not have pending charges at the time. She stated that she was a drug addict at the time.

The trial court found that evidence of Ms. Whitfield's prior work as an informant lacked relevance and was therefore inadmissible. In its order denying the motion for a new trial, the court stated:

> At trial, the defense initially framed the question as to how Ms. Whitfield had money to purchase drugs [after the Defendant's arrest], and the Court found that inquiry irrelevant. Later the court held a bench conference as to Ms. Whitfield's prior compensated police assistance, which the court still maintains is irrelevant. During trial, however, the defense was permitted to ask Ms. Whitfield about Crime Stoppers – and she responded that she did call but she hung up and did not [give] any tips – and whether she was receiving money at the time [the Defendant] confessed to her. Likewise, the detective leading the case testified no reward was made in this matter.

(Citations omitted.)

The State contends that the Defendant waived appellate consideration of this issue by failing to make a timely offer of proof regarding Ms. Whitfield's prior informant work. As we have noted, defense counsel stated on the record during the trial that he wanted to cross-examine Ms. Whitfield about prior work as an informant. The record reflects that the trial court and the parties were aware of the facts of her prior work, although no offer of proof was made relative to the existence of these facts. The court was able to make a ruling based upon the facts accepted as true, notwithstanding the absence of an offer of proof. The defense later offered Ms. Whitfield's affidavit in support of the motion for a new trial. The affidavit constituted evidence of the facts of which the parties appeared to have been aware when the matter was considered during the trial. Tennessee Rule of Evidence 103(a)(2) provides, in pertinent part:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

The record reflects that the substance of the evidence was known to the court at the time of its ruling and was provided in sworn form in support of the motion for a new trial. Given these circumstances, we conclude that the Defendant preserved the issue, and we reject the State's argument that the issue is waived.

Turning to the merits of the issue, the Defendant's proffer shows that Ms. Whitfield twice worked as a paid informant for a specific detective in another county by purchasing drugs. Her involvement in the present case is unrelated to any undercover drug operation, and there is no evidence that she approached Crime Stoppers or the law enforcement officers involved in this case seeking payment in exchange for information. Likewise, there is no proof she received any payment or other benefit in connection with this case. Permitting cross-examination about her prior work as an informant for a different law enforcement agency in unrelated cases would have invited speculation which lacked any factual basis relative to any purported motive to implicate the Defendant in the present case in exchange for money or some other benefit. Further, the record reflects that the defense was permitted to cross-examine Ms. Whitfield on other matters which related to her credibility. The Defendant has not shown that his right to cross-examine Ms. Whitfield was unreasonably restricted. *See Reid*, 213 S.W.3d at 839.

Because the trial court did not err in limiting the scope of the defense's cross-examination of Ms. Whitfield, the Defendant is not entitled to relief on this basis.

## VI

## Cumulative Trial Error

In a single sentence in the conclusion section of his brief, the Defendant contends that cumulative trial errors in the admission and exclusion of evidence entitle him to a new trial. The concept of cumulative error is that multiple errors, though harmless individually, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). To the extent that we have concluded that errors existed in the admission of Ms. Whitfield's prior statements, we have also concluded that no individual error prejudiced the Defendant. Considered collectively, we conclude that the effect of the errors remained insignificant. The Defendant has not shown that he was deprived of a fair trial on this basis.

## VII

## Sentencing

The Defendant contends that the twenty-five-year sentence he received for attempted first degree murder is excessive. He argues that the trial court failed to apply mitigating weight based upon the evidence that he had studied the Bible and had "developed a better understanding of his actions" during his incarceration, that he had maintained relationships with family members, that he had been a caretaker to others, and that he exhibited remorse for the shooting. He argues, as well, that his effective thirty-five-year sentence is greater than that which is deserved for his offenses, although he acknowledges the requirement of consecutive sentencing due to the firearm offense. *See*

T.C.A. § 39-17-1324(e)(1) (2018). The State contends that the trial court did not abuse its discretion relative to sentencing. We agree with the State.

The presentence report, which was received as an exhibit at the sentencing hearing, stated that the Defendant was twenty-four years old at sentencing. The presentence report and judgments received as exhibits reflect that he had convictions as an adult for assault, felony drug possession, two counts of possession of drug paraphernalia, and two counts of statutory rape. He had juvenile adjudications related to drug possession and possession of drug paraphernalia. He had obtained his GED while in juvenile custody. Other documents submitted as exhibits showed that the Defendant had been released on bail when he committed the present offenses and that his probation for another offense had been revoked previously.

In a written impact statement, the victim stated that, as a result of the offenses, she had post-traumatic stress disorder, was undergoing psychiatric treatment, and took medication. She stated that she had nightmares and that she regularly developed pneumonia due to her esophageal injuries from the shooting.

Pamela Ward, the Defendant's mother, testified that the Defendant had struggled "off and on" with drug addiction since the eighth or ninth grade. She said the Defendant developed anger issues after she and the Defendant's father separated when the Defendant was age ten and she and the Defendant relocated from Michigan to Tennessee. She said the Defendant's younger sister had an accident on the Defendant's third birthday and died the following day and that the Defendant had another younger sister who was still living. She said the Defendant's father had physically abused the Defendant. She said the Defendant had excelled in football and wrestling. She said the Defendant had been devastated when his father left the family. She said that the Defendant began acting out in school after they moved to Tennessee and that she had agreed for him to go to an alternative school and later for him to go into the State's custody. She said that she regretted sending him to the alternative school and that she had not understood the nature of the school and the other students. She said that after the Defendant obtained his GED, he had worked in landscaping and sales. She said that he had a child with his girlfriend and that he had been in barber school when he was arrested for the present offenses. She said that she had been supporting the Defendant, his girlfriend, and his child, all of whom had lived with her while the Defendant attended barber school.

Ms. Ward testified that after the Defendant was arrested and was in custody, he began attending Bible classes and talking about changing his ways. She said he was "a different person." She acknowledged that the Defendant had been a member of the Bloods gang. She said he told her that he could never completely disassociate himself from the gang because he would be a "dead man" if he did. She said she had been aware that an older man was using teenage boys to distribute drugs. She said that she went to

-43-

the police for help getting the Defendant away from the gang but that they never offered much help. She said the Defendant burned his gang paraphernalia and stated he wanted to "live on a straight path" in order to take care of his daughter.

Charlotte Cushing, the Defendant's maternal grandmother, testified that she and her husband had always been close to the Defendant. She said the Defendant worried about his family now that he was not with them. She said that the Defendant had been "crushed" when his father left the family and that the Defendant had wanted a father/son relationship. She said the Defendant's father had not maintained a good relationship with the Defendant after the Defendant moved to Tennessee.

Brittany Ward, the Defendant's sister, testified that the Defendant was a good brother. She said the Defendant was a hard worker and had a "good heart." She said she noticed a change in the Defendant when he was around age thirteen and started using drugs. She said the Defendant had potential to be successful.

Upon questioning by the trial court, defense counsel acknowledged that the Defendant had previously failed to comply with the terms of probation.

Defense counsel made the following argument relative to mitigating factors:

I would point to the childhood trauma that [the Defendant] suffered through the loss of his sister and the subsequent treatment by his father, the ultimate abandonment by his father, which directly [preceded] his decline into drug use and poor behavior. And I would also just point to the contrast between [the Defendant] and his younger sister who is four years younger. She didn't go through a lot of these same things. She testified she didn't have the same relationship with her father. As we heard, she was not alive at the time when her sister passed. And I think it's very clear that [the Defendant] struggled a great deal with those issues, and that's what led him into a downward decline.

After receiving the evidence, the trial court found that the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish his range classification. *See id.* § 40-35-114(1) (2014) (amended 2015, 2016, 2017) (The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that the Defendant had failed previously to comply with the terms of probation. *See id.* § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"). The court also found that the Defendant had a firearm during the commission of the offense. *See id.* § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other

deadly weapon during the commission of the offense[.]"). The court found that the Defendant had been released on bail when he committed the offense. *See id.* § 40-35-114(13)(A) ("At the time the felony was committed, one (1) of the following classifications was applicable to the defendant: . . . Released on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony[.]"). The trial court declined to apply any mitigating factors. Regarding mitigating factor (13), the factor the Defendant challenges on appeal, the trial court observed, "[H]e's obviously had a tough childhood, but I don't find that any of that justifies the conduct in this case." Ultimately, the court arrived at a twenty-five-year sentence for attempted first-degree murder and a mandatory, consecutive sentence of ten years for the firearm offense.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The Defendant does not contest the trial court's application of enhancement factors, but he argues that the court erred by failing to apply mitigating weight based upon his studying the Bible, developing "a better understanding of his actions" during his incarceration, maintaining relationships with family members, acting as a caretaker to others, and demonstrating remorse for the shooting. He argues that this evidence shows he was entitled to consideration pursuant to the so-called "catch-all" mitigating factor. *See id.* § 40-35-113(13) ("Any other [mitigating] factor consistent with the purposes of this chapter.").

We begin our analysis by noting that the Defendant's appellate argument is different from his argument in the trial court regarding the evidence which he contends supports the application of mitigating factor (13). He argued in the trial court that mitigation under factor (13) was appropriate because childhood trauma had precipitated a decline which led to his criminal activities. As we have stated, his appellate argument is that the factor is appropriate because he is remorseful, has positive family relationships, and has potential. As a general principle, "a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court." *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988); *see State v. Adkisson*, 899 S.W.2d 626, 635-36 (Tenn. Crim. App. 1994). Although the trial court was obligated by statute to consider the relevant facts and circumstances and to apply the appropriate mitigating and enhancement factors, a defendant who seeks the application of mitigating factor (13) should take care to articulate the facts upon which he relies. Factor (13) has no readily quantifiable criteria, and identification of the facts which support its application should be articulated in order for the trial court to know the basis upon which a defendant believes the factor should be applied.

In any event, the Defendant has not shown that the trial court abused its discretion in sentencing the Defendant. The Defendant's family members' testimony provided the evidence of his remorse, rehabilitative potential, and interest in religion. In contrast, in his trial testimony, the Defendant minimized his culpability for the shooting and claimed he shot the victim in self-defense. In addition, the evidence shows that the Defendant physically assaulted and shot the victim, fled without rendering aid, and lamented that he had not fired additional shots. It shows, as well, that the Defendant had been provided with several past opportunities to reform his criminal conduct to the bounds of the law. The trial court's findings regarding the enhancement factors for prior criminal history, previous failure to abide by the terms of release into the community, and commission of the present offenses while on probation show that the court was underwhelmed by any evidence which might support the application of mitigating factor (13) based upon the Defendant's alleged remorse, potential for rehabilitation, religion, and family ties. The four enhancement factors, when viewed in conjunction with the absence of any mitigating factors, provide an adequate factual basis to support the imposition of a maximum, twenty-five-year sentence for the attempted first degree murder conviction. The trial court did not abuse its discretion in imposing a maximum sentence.

To the extent that the Defendant complains that his effective sentence of thirty-five years is excessive, we note that a ten-year sentence for the firearms offense and consecutive sentencing for the two conviction offenses were required. T.C.A. § 39-17-1324(e)(1), (h)(2) (2018). Further, the record reflects that the trial court considered the

purposes and principles of sentencing in reaching its determination regarding the overall sentence. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE